**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **IUE-CWA, the Industrial Division of the Communications Workers of America, AFL-CIO, CLC,** | ) ) ) | **Case No. 10-CV-00091-MMB** |
| | ) | |
| **Appellant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **VISTEON CORPORATION, *et al.* and THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF VISTEON CORPORATION, *et al.*** | ) ) ) ) | |
| | ) | |
| **Appellees.** | ) | |
| ———————————————— | ) | |
| | ) | **On Appeal from U.S.** |
| **In re:** | ) | **Bankruptcy Court** |
| | ) | |
| **VISTEON CORPORATION, *et al.*,** | ) | **Chapter 11** |
| | ) | |
| **Debtors.** | ) | **Case No. 09-11786 (CSS)** |
| | ) | **(Jointly Administered)** |

**MEMORANDUM OF LAW IN SUPPORT OF IUE-CWA'S EMERGENCY MOTION FOR EXPEDITED CONSIDERATION AND MOTION FOR STAY, PENDING APPEAL, OF THE ORDER UNDER 11 U.S.C. §§ 105, 363(b)(1), AND 1108 AUTHORIZING DEBTORS TO AMEND OR TERMINATE CERTAIN POST-EMPLOYMENT HEALTH CARE BENEFITS AND LIFE INSURANCE BENEFITS FOR CERTAIN EMPLOYEES AND RETIREES AND THEIR SURVIVING SPOUSES, SPOUSES, DOMESTIC PARTNERS, AND DEPENDENTS**

## PRELIMINARY STATEMENT

The IUE-CWA, Industrial Division of Communication Workers of America, AFL-CIO,

CLC ("IUE-CWA") moves for entry of an order, pending the resolution of the captioned appeal,

staying the Order of the United States Bankruptcy Court for the District of Delaware under 11

U.S.C. §§ 1105, 363(b)(1) and 1108 Authorizing Debtors To Amend Or Terminate Post-

1

Employment Health Care and Life Insurance Benefits For Certain Employees and Retirees and Their Surviving Spouses, Spouses, Domestic Partners, and Dependents entered on December 22, 2009 (the "Order") (Docket #1491)(IUE-CWA 242-245).  IUE-CWA further moves on an emergency basis for an expedited hearing on this Motion for Stay prior to April 1, 2010, the date upon which the Debtors intend to terminate their contribution to retiree medical benefits ("the Benefits").  IUE-CWA seeks a stay of the Order to the extent it authorizes Visteon to discontinue payments for Benefits for those IUE-CWA retirees not eligible for Medicare benefits ("the Retirees").

On December 29, 2009, the IUE-CWA timely filed an appeal of the Order to this Court. The Notice of Designation of the Record was filed on January 12, 2010 (Docket No. 1589) and the Counter- Designation of the Record was filed on January 25, 2010 (Docket No. 1728).  This Court docketed the appeal on February 4, 2010.

The Order did not terminate the Benefits, but merely "authorized" the amendment or termination of the Benefits.  On or about January 29, 2010, the Debtors sent notices to IUE-CWA retirees advising that as of April 1, 2010, Visteon would no longer contribute to the cost of the Benefits (the "Notices").  Upon receipt of the Notices, on February 26, 2010, the IUE-CWA filed a Motion Pursuant to Bankruptcy Rule 8005 for Stay, Pending Appeal, of the Order Under 11 U.S.C. §§ 105, 363(b)(1), and 1108 Authorizing  Debtors to Amend or Terminate Certain Post-Employment Health Care Benefits and Life Insurance Benefits for Certain Employees and Retirees and Their Surviving Spouses, Spouses, Domestic Partners, and Dependents with the United States Bankruptcy Court for the District of Delaware (the "Stay Motion").  (Docket # 2407).

Following an evidentiary hearing before the Bankruptcy Court on March 16, 2010, the Bankruptcy Court denied the Stay Motion.

Because the Debtors intend to terminate their contribution to the Benefits effective April 1, 2010, and the vast majority of the Retirees have not opted to pay for the Benefits through the COBRA options offered by Visteon, the Retirees will suffer the irreparable harm of being without any medical benefits. The Retirees number approximately 840 IUE-CWA former employees of Visteon or its predecessors, who earned and paid for the Benefits over a life-time of service to the Debtors. The IUE-CWA, as part of this Motion, moves for expedited consideration by this Court of this Motion for Stay. Were this Court to employ the briefing schedule contained in Local District Court Rule 7.1.2, the IUE-CWA would be unable to have this Court enter an order on this Motion before such time as the Debtors would terminate its contribution to the Benefits. The Debtors, and the Official Committee of Unsecured Creditors which has intervened in the appeal, have agreed to the expedited briefing schedule. In addition, IUE-CWA has a likelihood of success on the merits of the appeal, issuance of a stay will not substantially injure the other parties interested in this proceeding, and the public interest lies in favor of staying the Order.

Currently, approximately 2,100 IUE-CWA retirees and their dependents are receiving or are eligible to receive Benefits paid for by the Debtors. Approximately 40%, or 840 of those retirees are not eligible for Medicare benefits. If the Order is not stayed and Visteon stops paying for the Benefits, the Retirees will be left without the Benefits. This Court should recognize that the Retirees, whose years, sometimes decades, of service were conditioned on the promise of secure retirement benefits, should not be subjected to the loss of the Benefits while their appeal of the Order is pending.

3

## JURISDICTION

This Court has jurisdiction over this Motion under 28 U.S.C. §§ 158 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory basis for the relief sought herein is 28 U.S.C. § 158, as supplemented by Rule 8005 of the Federal Rules of Bankruptcy Procedure.

## STATEMENT OF FACTS

### I.   ESTABLISHMENT OF THE BENEFITS

The IUE-CWA represented hourly employees at Debtors' Connersville, Indiana, and Bedford, Indiana facilities since 1956 (IUE-CWA 1). Approximately 1,700 retirees now receiving retiree medical benefits from Visteon worked at the Connersville Plant (Docket No. 424, ¶ 22(b)).  Approximately 400 retirees now receiving retiree medical benefits from Visteon worked at the Bedford Plant (Docket No. 424, ¶ 22(c)).

Beginning in the 1970's, the collective bargaining agreements between Debtors and the IUE-CWA required Debtors to provide the Benefits to IUE-CWA represented employees.  The availability of the Benefits was a critical component of the IUE-CWA collective bargaining relationship with Debtors.

At the Connersville facility, hourly employees first became eligible for the Benefits pursuant to a collective bargaining agreement in 1972 provided they paid the "full group rate". (IUE-CWA 10). The language in the original and subsequent collective bargaining agreements and Summary Plan Descriptions ("SPD"), limited the Debtors' ability to modify or terminate health benefits subject to collective bargaining requirements. (*See, e.g*., IUE-CWA 6). Over the

years, employees agreed to forego wage increases in exchange for the Benefits being paid by the company. (IUE-CWA 11-41).

The Connersville Plant was closed in 2007.  As part of the shut down, the IUE-CWA and Debtors executed a Closure Agreement which did not alter the employee benefit plan requirements. (IUE-CWA 42-48).  Indeed, the Release jointly approved by the Debtors and IUE-CWA covering the closing finalized in May 2007, expressly stated that the Closure Agreement does not limit or in any way, modify the provisions of any benefit plan and that the Release was the only agreement between the employee and Visteon. The Closure Agreement and Releases, signed by individual employees and negotiated by the IUE-CWA with Visteon, allow Visteon to amend or modify health benefits, but do not permit Visteon to terminate the Benefits. (IUE-CWA 46).

At the Bedford Plant, hourly employees first became eligible for the Benefits in 1979. (IUE-CWA 49-54).  Pursuant to language in the original and subsequent collective bargaining agreements and SPDs, the Debtors' ability to modify or terminate the Benefits was subject to collective bargaining requirements. (*See, e.g.,*IUE-CWA 55-56). Over the years, the employees agreed to forego wage increases in exchange for the promise of the Benefits. (IUE-CWA 57-91).

The Bedford facility was closed in 2008.  The IUE-CWA and the Debtors executed a Closure Agreement for the Bedford Plant, which did not alter the Debtors' employee benefit plan requirements. (IUE-CWA 92-97). As with the Connersville closing, the Closure Agreement and Releases, signed by individual employees and negotiated by the IUE-CWA with Visteon, allow Visteon to amend or modify health benefits, but do not permit Visteon to terminate the Benefits. The Releases also constitute the only agreement between Visteon and the employee. (IUE-CWA 95).

The Retirees relied on the Debtors' promises, formalized and made binding through the IUE-CWA and Debtors' collective bargaining agreements, to continue the Benefits throughout their lifetime.  Indeed, the employees agreed to help pay for the Benefits by accepting reduced wage increases.  At the Connersville Plant, an employee who worked 40 hours per week from 1981 to the closing of the plant in 2007, gave up approximately $24,000 in wage increases to contribute to the cost of the Benefits. (IUE-CWA 98-100).  The 1,700 Connersville Plant retirees now receiving the Benefits from Visteon collectively paid $40.8 million to fund the Benefits. At the Bedford Plant, an employee who worked 40 hours per week from 1980 to the closing of the plant in 2008, gave up approximately $61,000 in wage increases to contribute to the cost of the Benefits. (IUE-CWA 101-103). The 400 Bedford Plant retirees now receiving the Benefits from Visteon collectively paid $24.4 million to fund the Benefits. The Closure Agreements and Releases, which have no expiration date and continue in effect today, did not permit the Debtors to terminate the Benefits.  The effect of the Debtors' decision to terminate the payments for the Benefits is to deprive the Retirees of the Benefits to which they contributed part of the cost.

## II.    EFFECT ON RETIREES

Retiree Christina Bergen worked at the Connersville plant from 1972 to her retirement in July, 2004.  The least expensive health insurance plan offered by Visteon which would include prescription drug coverage would cost Bergen 30% of her income.  Bergen suffers from hypertension, spasmatic stomach, diabetes, thyroid problems, low potassium and is a cancer survivor.  She is required to take various medications, visit her family doctor at least once every three months, her breast doctor every 6 months, and her oncologist once each year. If Visteon is allowed to terminate its contributions to the Benefits, Bergen cannot afford to purchase health insurance from her limited income.  Without health insurance, she will be forced to go without

necessary medications, causing anxiety and aggravating her health condition. (IUE-CWA 134-135).

Retiree Ada Ruth Clark ("Clark") worked at the Connersville Plant from 1972 to her retirement in June, 2002.  The least expensive health insurance plan offered by Visteon which would include prescription drug coverage would cost the Clarks 23% of their income.  Clark suffers from COPD, hypothyroidism, hypertension, is a cancer survivor and had a stent put in her leg. She is required to take various medications, visit her family doctor three to four times each year with blood work done three times each year, visit a vascular surgeon once each year and have a daupler test done. Clark's spouse suffers from heart problems (which required a double by-pass and replacement of two valves), hypertension, high cholesterol, back problems and poor hearing (which cannot be corrected with hearing aids).  He is required to take various medications, visit the family doctor three times each year, visit the cardiologist every six months and must go to the hospital every month for a protime test. If Visteon is allowed to terminate its contributions to the Benefits, the Clarks cannot afford to purchase health insurance from their limited income.  Without health insurance, they will be forced to go without necessary medications, causing enormous anxiety and aggravating their health conditions which are worsened by stress. (IUE-CWA 136-138).

Retiree Daniel Cooley ("Cooley") worked at the Connersville Plant from 1973 to his retirement in January, 2008.  The least expensive health insurance plan offered by Visteon which would include prescription drug coverage would cost the Cooleys 57% of their income.  Cooley suffers from replacements of both knees. Cooley's spouse suffers from fibromyalgia, migraines, psoriasis, restless legs, lupus, high blood pressure.  She is required to take various medications, visit the doctor twice a week for injections for psoriasis, three times a week for therapy for the

psoriasis and to receive injections for migraines, as needed. Without insurance, the cost of the medications would be at least $350.00 per month and the cost of treatments would be $650.00 per month. If Visteon is allowed to terminate its contributions to the Benefits, the Cooleys cannot afford to purchase health insurance from their limited income.  They are already suffering anxiety attacks and losing sleep.  Bills are not being paid so medical treatments and medicines can be obtained.  They are going without food and are overdrawn at the banks so medicine can be purchased.  They are three months behind in their house payments and expect foreclosure papers to arrive any day.  Cooley's wife has been skipping doses of her medicine to extend it and her conditions have worsened. Without health insurance, they will be forced to go without necessary medications and treatments. (IUE-CWA 139-141).

Retiree Jerald Lee Eckerle ("Jerald Eckerle") worked at the Connersville Plant from 1995 to his retirement in August, 2004. The least expensive medical plan with prescription drug coverage offered by Visteon would cost the Eckerle's 25% of their income. Jerald Eckerle suffers from heart problems, high blood pressure and diabetes.  He is required to take various medications.  His spouse suffers from diabetes and high blood pressure.  She is required to take various medications. Both Jerald Eckerle and his spouse are deaf. If Visteon is allowed to terminate contributions to the Benefits, the Eckerles will not be able to pay for health insurance coverage.  They will be forced to pay for medical treatments and medications out-of-pocket. These increased costs may require them to delay or go without necessary treatments and medications because they are no longer affordable.  In addition, the loss of medical benefits will case enormous anxiety and aggravate their medical conditions, which are worsened by stress. (IUE-CWA 142-143).

Retiree Stephen Eckerle ("Stephen Eckerle") worked at the Connersville Plant from 1971 to his retirement in September, 2001. The least expensive medical plan with prescription drug coverage offered by Visteon would cost the Eckerles 32% of their income. Stephen Eckerle suffers from muscular dystrophy, diabetes and asthma.  He is required to take various medications. His spouse suffers from diabetes, fibromyalgia, chronic bursitis, arthritis and GERD.  She is required to take various medications.  Both Stephen Eckerle and his spouse require lab work to keep the medications stable. If Visteon is allowed to terminate its contributions to the Benefits, the Eckerles will not be able to pay for health insurance.  They risk losing their home and everything they have worked for all their lives. They will be forced to pay for medical treatments and medications out-of-pocket.  These increased costs may require them to delay or go without necessary treatments and medications because they are no longer affordable.  In addition, the loss of medical benefits will cause enormous anxiety and aggravate their medical conditions, which are worsened by stress. (IUE-CWA 144-146).

Retiree Sam Hankins ("Hankins") worked at the Connersville Plant from 1968 to his retirement in August, 2005. The least expensive medical plan with prescription drug coverage offered by Visteon would cost the Hankins' 56% of their income. Hankins suffers from heart problems (in 2007 he had 2 stents put in), low potassium and hypertension.  He is required to take various medications and visit his cardiologist two times each year. If Visteon is allowed to terminate contributions to the Benefits, the Hankins' will not be able to pay for health insurance. They will be forced to pay for medical treatments and medications out-of-pocket.  These increased costs may require them to delay or go without necessary treatments and medications because they are no longer affordable.  In addition, their house is not paid for and with increased

medical costs they will be financially overburdened.  This situation is causing Hankins sleepless nights and stress which can worsen his medical condition. (IUE-CWA 147-148).

Retiree McKinley Keen ("Keen") worked at the Connersville Plant from 1996 to his retirement in October, 2006.  The least expensive medical plan with prescription drug coverage offered by Visteon would cost the Keens 35% of their income. Keen suffers from high blood pressure and ulcers.  He is required to take various medications and visit his doctor every 6 months.  His spouse suffers from diabetes and heart problems.  She is required to take various medications and visit both the heart doctor and the family doctor every six months.  Without insurance, the cost of their prescription drugs would total $780.00 per month. If Visteon is allowed to terminate contributions to the Benefits, the Keens will not be able to pay for health insurance.  They will be forced to pay for medical treatments and medications out-of-pocket. These increased costs may require them to delay or go without necessary treatments and medications because they are no longer affordable. (IUE-CWA149-151).

Linda S. Kerr ("Kerr") worked at the Connersville Plant from 1970 to her retirement in July, 2001.  The least expensive medical plan with prescription drug coverage offered by Visteon would cost 30% of her income. Kerr suffers from hypertension, high cholesterol and atrial fibrillation with rapid ventricular response. She is required to take various medications, visit her family doctor every three months, visit her cardiologist at least once per year and get blood work done at the hospital once each month.  If Visteon is allowed to terminate its contributions to the Benefits, she will not be able to pay for health insurance. She will be forced to pay for medical treatments and medications out-of-pocket.  These increased costs may require her to delay or go without necessary treatments and medications because they are no longer affordable.  She will

have to choose between paying her mortgage or buying food and paying for doctor visits or prescription drugs. (IUE-CWA 152-153).

Vicki Jo Lady ("Lady") worked at the Connersville Plant from 1970 to her retirement in July, 2003. The least expensive medical plan with prescription drug coverage offered by Visteon would cost the Ladys 65% of their total income.  Lady suffers from ADHD, depression, COPD and arthritis.  She is required to take various medications and visit her doctor every three months.  Her spouse suffers from emphysema, COPD, manic depression, and schizophrenia. He is required to take various medications and visit his doctor every 6 months. If Visteon is allowed to terminate contributions to the Benefits, the Ladys will not be able to pay for health insurance. They will be forced to pay for medical treatments and medications out-of-pocket.  These increased costs will require the Ladys to delay and go without necessary treatments and medications because they are no longer affordable.  In addition, financial distress will add to their medical conditions and they will have to choose between buying food and paying for prescription drugs and doctor visits. They will not be able to survive. (IUE-CWA 154-155).

Mrs. Lady testified at the hearing on March 16, 2010 before Judge Sontchi that she did not select any of the COBRA plans offered by Visteon because:  "I can't afford it.  If I – if I pay the COBRA then I can't pay for my house.  I can't pay the electric.  I can't buy the groceries.  I can't go to the doctor."  (IUE-CWA 411:14-16).

Retiree David Snedigar ("Snedigar") worked at the Connersville Plant from 1985 to his retirement in 2005.  The Snedigars have one dependent child. The least expensive medical plan with prescription drug coverage offered by Visteon would cost the Snedigars 86% of their total income. Snedigar's spouse suffers from cancer, chemotherapy, radiation and high blood pressure. Snedigar's wife was just diagnosed with cancer three weeks ago and they have been

11

trying to find some kind of help.  With the pre-existing condition, his wife is uninsurable except through COBRA, so they have decided to take the COBRA option for her, leaving Mr. Snedigar and their son without health benefits. They are experiencing anxiety and sleeplessness right now. They will be forced to pay for medical treatments and medications out-of-pocket.  These increased costs may require them to delay or go without necessary treatments and medications because they are no longer affordable. (IUE-CWA 156-157).

Mr. Snedigar testified at the hearing before Judge Sontchi, explaining that he might have to sell his place and does not know what he will do if Visteon stops paying for the Benefits. (IUE-CWA 406:6-12).

Retiree Frankie Shepard ("Shepard") worked at the Connersville Plant from 1973 to his retirement in 2007. The least expensive medical plan with prescription drug coverage offered by Visteon would cost the Shepards 36% of their total income.  Shepard suffers from lung cancer, PAD and CPD.  He is required to take various medications and visits his doctor regularly for blood tests and X-rays.  Shepard's spouse suffers from mild diabetes, high cholesterol and high blood pressure.  She is required to take various medications. If Visteon is allowed to terminate its contributions to the Benefits, the Shepards will not be able to pay for health insurance.  They will be forced to pay for medical treatments and medications out-of-pocket.  These increased costs may require them to delay or go without necessary treatments and medications because they are no longer affordable.  The loss of medical benefits will cause enormous anxiety and aggravate their medical conditions, which are worsened by stress. (IUE-CWA 158-159).

Retiree Carolyn Spurlock ("Spurlock") worked at the Connersville Plant.  The least expensive health insurance plan offered by Visteon which would include prescription drug coverage would cost the Spurlocks 16% of their income.  Spurlock suffers from hypertension,

high cholesterol and diabetes. She is required to take various medications daily and visit her doctor every three months. Spurlock's spouse suffers from COPD, hypertension, high cholesterol and acid reflux. He is required to take various medications and visit his doctor every three months. If Visteon is allowed to terminate its contributions to the Benefits, the Spurlocks will not be able to pay for health insurance.  Without health insurance, they will be forced to go without necessary medications and doctor visits, causing anxiety and aggravating their health conditions. (IUE-CWA 160-162).

Linda Darlene Roberts ("Roberts") worked at the Connersville Plant from 1992 to her retirement in May, 2004.  The least expensive health insurance plan offered by Visteon which would include prescription drug coverage would require cost the Roberts 65% of their income. Roberts suffers from high blood pressure, high cholesterol, chest pain and has been diagnosed with multiple myeloma and leukemia. She is required to take various medications, visit a clinic four times each year for blood work and visit a heart specialist once each year.  Roberts' spouse suffers from high cholesterol, high blood pressure, multiple herniated discs and kidney stones. He is required to take various medications, visit the family doctor three times each year and have blood work every six months.  If Visteon is allowed to terminate its contribution to retiree medical benefits, they will not be able to purchase alternate coverage.  They will be forced to go without necessary treatments and medications which they will not be able to afford.  The loss of medical benefits will cause enormous anxiety and unimaginable worry that aggravates their medical conditions which are worsened by stress.  (IUE-CWA 239-241).

In addition to the 13 Declarations that have been filed, 13 retirees submitted questionnaires, showing the specific harm they will suffer if the cost of the Benefits transferred to them.  (IUE-CWA 213-238).  For example, Scott Moore would be required to pay 63% of his

income for health benefits for himself and his wife, who has been diagnosed with Stage 4 lung

cancer and lesions on her brain and spine.  (IUE-CWA 231-232).

Other retirees wrote to the bankruptcy court explaining how the termination of Visteon's

contribution to the Benefits would affect them. Retiree spouse, Deborah J. Metcalf, wrote to the

bankruptcy court, stating:

> Less than 2 years after [my husband] Mack retired we found out he had cancer.
> Not only did Mack have cancer but so had a lot of the people he had worked with.
> Mack had surgery, a year of chemo and 30 radiation treatments.  He has had to
> have CT scans, x-rays and blood work on a regular basis.  It's not been easy
> making it.  Our insurance pays less & less every year.  They won't even pay for
> my mammograms.  Now because Visteon files bankruptcy, they can just walk
> away from the working people who gave their life for that job.

(IUE-CWA 111-112).

The communities of Connersville and Bedford, Indiana in which the IUE-CWA retirees

worked and live, will also be devastated if retiree health benefits are eliminated.  The Mayor and

City Council of Connersville stated in a letter to the Court:

> As mayor and on behalf of the City of Connersville, we are writing to you to
> voice our opinion over the possibility of Visteon declaring bankruptcy on the
> health and death benefits of the retirees.  If you are not aware, let us make you
> aware of the impact that would have not only on our community but the
> surrounding communities as well.  We are in the double digits of unemployment
> and have been for several years.  Our community has suffered much with the loss
> of Visteon.  These retirees are finding it difficult to make ends meet as well as
> worry about providing for healthcare costs.   Many of them are still unemployed.
> They have worked numerous years to take care of themselves and their families.
> It is also a severe economic impact on the other citizens of Connersville who are
> not employed by Visteon.  This would be devastating to our local hospital and
> other healthcare facilities.  Therefore, we are asking you in the bankruptcy
> decisions to please keep these benefits that were promised so long ago in force.
> Thank you.

(IUE-CWA 115).

The Mayor of Connersville testified at the hearing before the bankruptcy court on March

16, 2010, describing the impact on his constituents if Visteon ceases to pay for the Benefits:

I have a stack that high on my desk that people have brought into my office telling me they have lung cancer, they have prostate cancer.  Most men over sixty will face something like that.  Lots of breast cancer.  People that come in there to me and say what'll I do.  I can't get insured anyplace else.  I'm drawing 1700 dollars a month.  It takes 800 for COBRA.  It leaves me – you got to pay tax on that. Pension. It leaves me 7 or 800 dollars a month to live on.  So they lose their home.  They lose their car.  And that's the type life they have to live in the golden years after they spent anywhere from twenty-seven to thirty to thirty-five years.

(IUE-CWA 417:8-19).

The Fayette County Board of Commissioners stated in a letter submitted to the Court:

We, the Commissioners of Fayette County Indiana, would like for those in charge of the Visteon bankruptcy case to consider the well-being of the former employees and the six-county region's economic stability when considering the retirement benefits of said former employees.

A court hundreds of miles away could easily view the accounts that back those benefits as an asset worthy of liquidating in order to pay debtors.  To those former employees, however, they are not assets, but rather lifelines.  Those people worked for their entire careers, understanding that they would be able to retire and receive adequate health care.  To strip them of their lifelines seems unconscionable.

Moreover, should their benefits be taken away, the systemic "ripple effect" that would permeate the local economy would be devastating.  The far-reaching impact of such a loss would impact the health care system, housing welfare, education, etc.  The overall economic effect would be one of total depression.  Please keep the aforementioned points in mind in resolving the Visteon bankruptcy.

(IUE-CWA 116).

## III.    HISTORY OF THIS MOTION

On June 26, 2009, Debtors filed their Motion for Order Authorizing Them to Amend or

Terminate Post-employment Health Care and Life Insurance Benefits for Certain Employees and

Retirees and their Surviving Spouses, Spouses, Domestic Partners and Dependents ("Debtors'

Motion") (Docket No. 424).  IUE-CWA objected to the Motion (Docket Nos. 530 and 711).  In

opposition to Debtors' Motion, the IUE-CWA argued that § 1114 of the Bankruptcy Code, 11

U.S.C. § 1114, required the Debtors to negotiate with the IUE-CWA before proposing to eliminate the Benefits and that the Benefits were vested.

The Bankruptcy Court held a hearing on Debtors' Motion on August 13 and 14, 2009. IUE-CWA presented evidence that retirees were promised that they would have life insurance and medical benefits for life and even that they had paid for the continuation of those benefits by agreeing to lower wage increases for many years in exchange for the provision of lifetime medical and life insurance benefits.  (IUE-CWA 117-119). The IUE-CWA also presented evidence that showed that the average worker had paid approximately $24,000 at the Connersville Plant and $61,000 at the Bedford Plant over their working career for the promise of lifetime medical and life insurance benefits. (IUE-CWA 98-103). These payments had the effect of vesting each worker with the right to lifetime retiree medical care.

On December 22, 2009, this Court entered its Order granting the Motion. On December 29, 2009, IUE-CWA entered its Notice of Appeal of that Order (Docket No. 1512).

On or about February 1, 2010, the Debtors sent notices to IUE-CWA retirees advising that as of April 1, 2010 Visteon would no longer contribute to the cost of the Benefits and that retirees had the option to pay for the Benefits themselves by making a COBRA election (IUE-CWA 120-131).  The cost of the COBRA plans offered depends on whether the coverage needed by the retiree is for a single, a couple or a family, whether the covered person is Medicare eligible and the geographic location of the retiree.  The costs range from $120.69 per month for a single retiree on Medicare to $2,247.24 per month for non-Medicare eligible family coverage. (IUE-CWA 132-133).

## **ARGUMENT**

### I.   VISTEON'S DISCONTINUATION OF ITS CONTRIBUTION TO THE BENEFITS SHOULD BE STAYED PENDING APPEAL

The Order should be stayed because there is a likelihood of success on the merits of the appeal, retirees will be irreparably injured if the stay is not granted, other parties will not be substantially harmed if the stay is granted, and the public interest lies in favor of granting the stay. Rule 8005, Fed. Rules of Bankr. Proc., entitled Stay Pending Appeal, provides, in relevant part that "a motion for such relief, or for modification or termination of relief granted by a bankruptcy judge, may be made to the district court … but the motion shall show why the relief, modification or termination was not obtained from the bankruptcy judge." The standards for determining whether a stay should be granted are the following:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Republic of the Philippines v. Westinghouse Electric Corporation*, 949 F.2d 653, 658 (3d Cir. 1991).

No single factor should be considered in isolation; rather, the court must balance and weigh all relevant factors. *See In re Calabria*, 407 B.R. 671, 678 (Bankr.W.D.Pa.2009) ("[F]ailure to satisfy any one of the four factors ... might not necessarily be fatal to a motion for stay pending appeal.  Rather, to determine whether a stay pending appeal is warranted, the court is to balance each of the factors at issue and examine individualized considerations relevant to the case.") *See also In re Countrywide Home Loans, Inc.*, 387 B.R. 467, 471 (Bankr. D. Del. 2008) (Judge Agresti), ("A decision on a motion for stay should reflect 'the individualized considerations relevant to the case at hand.'" Quoting *Republic of the Philippines v. Westinghouse Elec. Corp.,* 949 F.2d 653, 658 (3d Cir. 1991)); *In re W.R. Grace & Co.,* 08-CV-

246, 2008 WL 5978951 (D. Del. Oct. 28, 2008) (Senior District Judge Buckwalter); *In re Freedom Communications Holdings, Inc.,*09-CV-825, 2009 WL 4506553(D. Del. Dec. 4, 2009) (Judge Robinson).

The Third Circuit and the Delaware District Court have both recognized that in an appeal from a decision of the bankruptcy court, "a myriad of circumstances can occur that would necessitate the grant of a stay pending appeal in order to preserve a party's position." *In re Delaware and Hudson Rwy. Co.*, 129 B.R. 388, 394-395 (D. Del. 1991), quoting *In re Highway Truck Drivers & Helpers Local Union # 107*, 888 F. 2d 293, 298 (3d Cir. 1989). Here, each of the factors weighs in favor of granting the motion for a stay.

## II.      THE IUE-CWA HAS A HIGH LIKELIHOOD OF SUCCESS ON THE MERITS OF THE APPEAL

The issue posed on appeal by IUE-CWA is: "In light of the requirements of 11 U.S.C. § 1114, was the order granted improperly where Debtors did not first negotiate over revocation of retiree benefits and where the Court did not consider whether Debtors made a significant showing that the health and life insurance benefits of IUE-CWA retirees are not vested?" (Docket No. 1512).

### A.      Retiree Benefits May Not Be Terminated Or Modified In A Bankruptcy Proceeding Except In Compliance With § 1114

In spite of the plain and unambiguous language of § 1114, the Order authorized Debtors to terminate the Benefits without resort to the strictures of § 1114.  Section 1114(a) defines "retiree benefits" to mean:  "payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise)

maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title." This unqualified, expansive definition of "retiree benefits" plainly encompasses the Benefits provided by the Debtors for the Retirees before initiating the bankruptcy proceeding.

In addition to a comprehensive description of "retiree benefits" covered by § 1114, the statute supplies an exclusive provision for the treatment of "retiree benefits" in the course of a bankruptcy proceeding. Section 1114(e)(1) states: "Notwithstanding any other provision of this title, the debtor in possession … shall timely pay and shall not modify any retiree benefits, except that – (A) the court, on motion of the trustee or authorized representative, and after notice and a hearing, may order modification of such payments, pursuant to the provisions of subsections (g) and (h) of this section" or by agreement. Subsections (f), (g) and (h) of § 1114 set forth the conditions under which a court may enter an order modifying the payment of retiree benefits. Those conditions include:

- Presentation to the authorized representative of retirees of a proposal for "those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor", § 1114(f)(1)(A);

- Provision to "the representative of the retirees with such relevant information as is necessary to evaluate the proposal", § 1114(f)(1)(B);

- Meetings with the authorized representative of retirees "to confer in good faith in attempting to reach mutually satisfactory modification of such retiree benefits", § 1114(f)(2);

- Refusal of the authorized representative of the retirees to "accept such proposal without good cause", § 1114(g)(2);

- A finding by the Court that "such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities", § 1114(g)(3);

None of these conditions were met.

Debtors were authorized to terminate the Benefits not pursuant to § 1114, but pursuant to §§ 105, 363(b)(1) and 1108. These sections of the Code do not purport to override or supersede § 1114. And, if there was a conflict between any of these sections and § 1114, the exclusivity provision of § 1114 determines that it would prevail. The Bankruptcy Court relied on its general power and the general authority of the Debtors to authorize termination of the Debtors' payments for the Benefits without referencing the exclusivity provision of § 1114. Instead, the Bankruptcy Court held that § 1114 applies only if the Benefits are vested. (IUE-CWA 348-354: at 18-24).

This argument was considered and rejected in *In re Farmland Industries, Inc.* 294 B.R. 903, 917 (W.D. Mo. 2003), where the court stated:

> There is nothing in the language of the statute to suggest that Congress intended to allow the termination of retiree benefits in those instances where the debtor has the right to unilaterally terminate those benefits under the language of the plan or program at issue. While they assert this right in the pending Motions, the Debtors have not pointed to any language in the statute that would create such an exception. Nor can they, for it does not exist. In fact, if one were to accept the Debtors' argument, the statute would be eviscerated and rendered virtually meaningless. Any debtor – most debtors, more than likely – would be able to point to language in the underlying documents establishing voluntary programs such as the Debtors' giving them the right to unilaterally terminate the programs. With that exception granted, the statute would essentially only apply to collective bargaining agreements or other bargained-for programs and the legislative history makes it clear that such limitations were not intended. The language of the statute is all-encompassing.

*See also, In re Ames Department Stores, Inc.*, Nos. 92-CV- 6145 and 6146, 1992 WL 373492 at *1 (S.D.N.Y. Nov. 30 1992) (Duffy, J.) (Rejecting debtor's appeal of orders under § 1114 based

on the debtor's asserted unilateral right to terminate retired employees' insurance benefits, stating: "[T]he Debtor's cavalier attempt to unilaterally terminate the Retired Employees' insurance benefits produces as drastic and most undeserving result. Thus, as directed by the Bankruptcy Court, the Debtor must follow the requirements of § 1114 of the Bankruptcy code if it seeks to terminate the Retired Employees' life insurance benefits.")

The basic principle that courts must apply the plain meaning of the words of a statute was expressed by the Third Circuit in *Government of the Virgin Islands v. Knight*, 989 F.2d 619, 633 (3d Cir. 1993), as follows:

> It is axiomatic that statutory interpretation begins with the language of the statute itself. *Pennsylvania Dep't of Pub. Welfare v. Davenport,* 495 U.S. 552, 557-58, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990). Courts presume that Congress expressed its legislative intent through the ordinary meaning of the words it chose to use, and if the statutory language is unambiguous, the plain meaning of the words ordinarily is regarded as conclusive. *See Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The plain meaning rule, however, is not absolute. A court may consider persuasive legislative history that Congress did not intend the words they selected to be accorded their common meaning. *Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981) (cited in *Smith v. Fidelity Consumer Discount Co.,* 898 F.2d 907, 910 (3d Cir.1990)). A construction inconsistent with a statute's plain meaning, however, is justifiable only when clear indications of a contrary legislative intent exist. *Consumer Party v. Davis,* 778 F.2d 140, 147 (3d Cir.1985). In other words, if the statutory language is clear, a court must give it effect unless this "will produce a result demonstrably at odds with the intention of [the] drafters." *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 570, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982).

Here, the legislative history supports the conclusion that Congress did not intend to limit the application of § 1114 to vested retiree benefits. Congress passed § 1114 in response to the threat by LTV Steel Company to cancel retiree benefits of 78,000 retirees by enacting the Retiree Benefits Bankruptcy Protection Act of 1988 ("RBBPA"). The legislative history of the RBBPA makes it clear that Congress did not intend to limit the purview of § 1114 to collectively bargained plans. Senator Helfin stated: "This legislation protects retired employees who are

covered by a collective bargaining agreement, as well as those where no collective bargaining agreement is in effect." 133 Cong. Rec. 21,099. Senator Metzenbaum clarified that § 1114 was intended to apply "even after the termination of a collective bargaining agreement. Only if a company can prove a modification is absolutely necessary and that it treats everyone fairly can a court, after a hearing, order any modification." *Retiree Benefits Security Act of 1987:  Hearings on S. 548 before the Subcomm. on courts and Administrative Practice of the Senate Comm. on the Judiciary*, 100th Cong., 1st Sess. 14 (1987).

The Bankruptcy Court ignored this legislative history and the plain language of the statute to hold that § 1114 applies only in the case of benefits provided pursuant to an existing collective bargaining agreement. The Bankruptcy Court specifically ruled that the Debtors could not terminate the benefits of those who retired during the term of the agreements which had been negotiated by the UAW on behalf of employees working at Visteon's North Penn Facility. (IUE-CWA 244-245). This ruling resulted in the anomalous situation where health benefits of recent retirees were protected while health benefits of long-term retirees were eliminated. By this ruling, the Bankruptcy Court limited the application of § 1114 to a very narrow category of retiree benefits, rendering its provisions virtually superfluous and ineffectual. Such a negation of the effect of the words and intent of a statute is not permitted by the courts.

**B.      The Bankruptcy Court Erred in Failing to Require Debtors to Make a Significant Showing that the Retiree Benefits Were Not Vested**

In its ruling, the bankruptcy court stated as follows:

[The] Court finds that as a matter of applicable non-bankruptcy law, as well as the plain meaning of the controlling documents, the debtors would have, outside of bankruptcy, the right to terminate these plans at will subject, of course, to any agreement to provide, in effect, the equivalent of COBRA or another transition-type agreement. … The reason that the benefits can be terminable under state law, and this is important for the ruling, is that they are not vested. In making my ruling, I incorporate in toto Judge Drain's analysis in Delphi Corporation, and I

rely on that analysis as a support for my ruling. That's located at 2009 Westlaw 637315.

(IUE-CWA  352:12-24).

In *In re Delphi Corp.*, 2009 WL 637315, No. 05-44481 (RDD) (Bankr. S.D.N.Y. March 10, 2009), Judge Drain considered the question of whether retiree medical benefits were vested for salaried retirees, who never had a collective bargaining agreement with Delphi which provided for retiree medical benefits and did not assert that they had negotiated reduced wage increases in exchange for lifetime retiree medical benefits, as shown by the Retirees here.  Even in the absence of the strong showing of a promise of lifetime medical coverage made by the Retirees, Judge Drain ruled that the debtors had the factual burden to show that the retirees were not promised lifetime medical benefits, which he viewed as a "serious one".  2009 WL 637315 at *8. Judge Drain stated:

> [B]efore a bankruptcy court should permit a debtor to modify or terminate a health or welfare plan under Section 363(b) on the theory that it has the right to do so under applicable non-bankruptcy law, the debtor must make a significant showing that it, in fact, has such a unilateral right and that the benefits are not vested.

*Id.* at *7.

In fact, Judge Drain decided to appoint a committee pursuant to § 1114 to "review the factual record to determine whether, under the logic that I've just set forth with regard to vesting under ERISA, and notwithstanding the language in the plan documents, there is any group of beneficiaries of these plans, any retirees, who would have vested rights."  *Id.* at 8.

Here, the Retirees have demonstrated not only that they were promised the Benefits pursuant to their collective bargaining agreements, including the unexpired Closure Agreements and Releases, but also that they paid for the Benefits by foregoing wage increases.  The

Bankruptcy Court's summary conclusion that the Benefits are not vested does not demonstrate that the Debtors met the "significant showing" required by *Delphi*.

While Employers are generally free to adopt, modify or terminate welfare plans, they may agree to relinquish their rights unilaterally to terminate those benefits, and instead provide vested lifetime benefits which may not be terminated unilaterally. *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, v. Skinner Engine Company*, 188 F.3d 130 (3d Cir. 1999). To determine whether an employer has intended to vest benefits, courts must look to the language of the plan documents themselves. *In re Unysis Corp. Retiree Medical Benefit "ERISA" Litigation*, 58 F.3d 896, 902 (3d Cir. 1985). In a traditional ERISA setting, a plan participant bears the burden of proving, by a preponderance of the evidence that the employer intended welfare benefits to be vested. *Id.* However, ambiguous language in plan documents does not show that retiree benefits are unvested. *Alexander v. Primerica Holdings, Inc.,* 967 F.2d 90, 95-96 (3d Cir. 1992). In the context of a § 363 summary proceeding to terminate retiree health benefits, however, the debtor must provide a substantial showing that the benefits in question are not vested before they are allowed unilaterally to terminate them. *In re Delphi Corporation*, 2009 WL 637315, *7, No. 05-44481 (March 10, 2009).

> ### C.   The Benefits Are Vested

The Benefits for which Debtors are discontinuing payment were created through the course of a long contractual relationship between the Debtors and the IUE-CWA. The documents presented by the Debtors in support of their §363 motion indicate an intention to provide benefits for a lifetime duration to covered employees.

For example, the 2006 Connersville Plan and Summary Plan Description specifies that the Benefits will be provided subject to the following eligibility requirements: 1) the employee was eligible for medical and prescription drug coverage on their last day of work; 2) the employee was not a deferred vested retiree; 3) the employee applies within 60 days of their retirement date or pension commencement date (IUE-CWA 169). Furthermore, the 2006 Plan and SPD specifies that retiree benefits will continue to surviving spouses upon the retiree's death. *Id.* In establishing the guidelines for ending coverage, the 2006 Plan and SPD states that the coverage generally remains in effect as long as the eligibility requirements are met. (*Id.* at 16.) Further, in establishing guidelines for continuing coverage, the 2006 Connersville Plan and SPD provides for retiree medical coverage to continue "through retirement" so long as necessary contributions are made. (*Id.* at 18.)

Similarly, the 2004 Bedford Plan and SPD provides that retiree health benefits will be available to retirees that meet the following criteria: 1) the retiree was eligible for medical coverage as an active employee; 2) the retiree was hired on or after June 14, 2004 and retired with at least 20 years of Credited Service under the pension plan; 3) the retiree was not a deferred vested retiree (IUE-CWA 190). The 2004 Bedford Plan and SPD further sets forth that eligible surviving spouses retiree medical benefits continue until the surviving spouses' date of death. (*Id.*) Likewise, in discussing the continuing coverage guidelines, the 2004 Bedford Plan and SPD establishes that Medical coverage for retirees "continues during retirement until your death." (*Id.* at IUE-CWA 200).

The plain language of the Plan documents and SPDs thus created a lifetime benefit for the Retirees. In each document, the benefits are extended to the Retirees until death and then to

qualified surviving spouses and dependents.  This language creates a vested interest for each of the Retirees.

In addition, the IUE-CWA presented evidence that the employees agreed to lower wage increases in exchange for the provision of the Benefits for their lifetimes (IUE-CWA 98-103).  While these foregone wage increases did not pay for the entire cost of the Benefits, they demonstrate that the employees made a significant contribution to the cost of the Benefits.  Moreover, the foregone wage increases demonstrate that the employees relied to their detriment on a promise of lifetime medical benefits.  Employees would not have been eager to contribute to the cost of the Benefits if they understood that when they were enjoying the Benefits in their golden years, Visteon could totally eliminate them after having had the advantage of paying lower wages for decades.

The Third Circuit recently recognized that failing to inform retirees that their medical benefits could be terminated when they were deciding whether to retire was misleading and a violation of ERISA.  *In re Unisys Corporation Retiree Medical Benefits ERISA Litigation*, 579 F.3d 220 (3d Cir. 2009).  While this matter does not at this point arise under ERISA, the principles of detrimental reliance do apply here.  The Third Circuit enunciated the elements which must be shown to establish equitable estoppel in *Unisys II*:  "a material misrepresentation, reasonable and detrimental reliance upon the representation, and extraordinary circumstances." 58 F.3d at 907.  Here, employees were promised that if they accepted reduced wages they would receive lifetime medical benefits.  Employees reasonably relied on that misrepresentation by agreeing to reduced wage increases which was to their detriment.  The extraordinary circumstances here are the payments made for the Benefits.  Diligent research did not reveal another case in which such a circumstance was present.  However, in *Alexander,* the Third

Circuit refused to allow the employer to eliminate retiree health benefits where the employer promised employees that they would have lifetime medical benefits "to recruit and retain employees despite salaries below the industry average". 967 F.2d at 96.  Thus, the court determined that foregoing higher salaries for retiree benefits was a factor in finding that the benefits were vested.

In addition, the Closure Agreements and Releases, which have no expiration date and continue in effect, do not allow the Debtors to terminate the Benefits.  Rather, those agreements provided that they do not limit or in any way modify the provisions of any benefit plan, and that employee benefit plans may be amended.  Those collective bargaining agreements do not permit termination of the Benefits.  The Release signed by each employee and "jointly approved by IUE-CWA and Visteon" states:  "My acceptance constitutes the entire and only agreement between me and Visteon.  I understand that I shall not be eligible for recall to work.  I understand that Visteon may in the future amend its benefits plans and make available different retirement, placement or separation benefits for which I may not be eligible."  (IUE-CWA 46, 95).  Even though the Release states that there is no other agreement between the Retirees and Visteon, the Debtors argue, contrary to the language of the Release, that the Plan Documents override this language.  Moreover, the Plan Documents themselves acknowledge that their provisions are "subject to the collective bargaining agreements".  (*See, e.g.* IUE-CWA 56).

The Release also provides:  "I understand that this release form does not authorize Visteon to exclude me from future increased Pension or other benefits, if any, for which I may otherwise be eligible."  (IUE-CWA 47).  Nowhere does the Release provide that Visteon may eliminate its payment of the Benefits.  By signing the Releases, the Retirees agreed that they

would not bring suit against Visteon for any claim arising out of their employment, but the
Release did not "waive any claims that arise after the date I separate from employment."

After the closing of the Connersville Plant in 2007 and the Bedford Plant in 2008,
Visteon continued to pay for the Benefits to the present.

### D.     The Debtors' Reservation of Rights Is Ambiguous

Reservation of rights language will not always prevail over a promise of benefits. *Unysis
II*, 58 F.3d at 896, n.11.  Due to the abundance of ERISA plans and the differing benefits these
plans provide, each case must be considered on its own facts. The court must make its
determination about the Benefits provided based on the language of the particular documents it
has been called upon to review. *Id.*  As a matter of law, an ambiguous reservation of rights
clause will not defeat a claim of vested benefits. *Alexander v. Primerica Holdings, Inc.*, 967 F.2d
90 (3d. Cir. 1992).

The Debtors' reservation of rights clauses are ambiguous and do not undermine the
vested nature of the Benefits.  Specifically, the Debtors' reservation of rights clauses expressly
condition the Debtors' ability to terminate or modify benefits on its compliance with collective
bargaining requirements.  For example, the reservation of rights clause in the 2006 Connersville
Plan and SPD states that "…the Company reserves the right to suspend, amend or terminate the
Plan—or any of the coverages or features provided under the Plan—at any time and in any
matter to the extent permitted by law (subject to the collective bargaining requirements)."  (IUE-
CWA 169)(Emphasis added). The 2004 Bedford Plan and SPD contains an identical reservation
of rights clause (IUE-CWA 183).

The reservation of rights clauses do not evidence an unambiguous right to unilaterally
terminate the Benefits.  Instead, the language recognizes the superiority of bargaining obligations

over the reservation of rights with respect to the Benefits.  Such language is consistent with the above-noted provisions of the Plans which establish a lifetime vested interest in health benefits for the IUE-CWA members at the Connersville and Bedford facilities.  Importantly, the most recent collective bargaining agreements between the IUE-CWA and Debtors—the Closure Agreements and Releases—do not permit termination of the Benefits.  The jointly approved waiver and release form that accompanied the Connersville Closure Agreement expressly states that: "The Plant Closure Agreement does not limit or in any way modify the provisions of any benefit plan." (IUE-CWA 42-48 and 92-97).  The Closure Agreements and Releases continue in effect. Accordingly, the Debtors at no time have reserved an unambiguous and unilateral right to terminate their payments for the Benefits.

**E.      Debtors Have Not Made A Substantial Showing That the Benefits Were Not Vested**

As decided by Judge Drain, where a debtor moves pursuant to § 363 to terminate or modify obligations that would ordinarily be within the scope of § 1114, the debtor must first demonstrate that it has a unilateral pre-petition right to so modify and that the benefits in question are not vested. *In re Delphi*, 2009 WL 637315, *7 No. 05-44481 (Bankr.S.D.N.Y. ). The question is a "serious one" and imposes a substantial burden on a debtor. *Id.*

Here the Debtors failed to make a substantial showing that the rights in question are outside the scope of §1114.  Not only do the Plan documents relied on by the Debtors grant a lifetime benefit to the Retirees, but the reservation of rights clauses contained within those documents are qualified by a duty to bargain over any modification or termination.  The collective bargaining agreements still in effect permit modification, but not termination of the payment for the Benefits. In light of the plain language of the Plan documents and the Debtors' elevated burden of proof, the IUE-CWA has a substantial likelihood of success on the merits.

29

**III.    THE RETIREES WILL BE IRREPARABLY HARMED IF VISTEON
ELIMINATES ITS CONTRIBUTION TO THE BENEFITS**

The Retirees have submitted declarations demonstrating the irreparable harm to them if

Visteon discontinues its payment for the Benefits.  The COBRA plans offered by Visteon require

Retirees to pay up to $2,247.24 per month for family benefits.  For those who are not Medicare

eligible, the lowest available plan with prescription drug coverage would cost $670.85 for a

single retiree.  Pension benefits received by the retirees do not exceed $2,500 per month.  Thus, a

single retiree could be required to spend more than 25% of his income on medical benefits.  One

couple with serious health problems, the Ladys, would be required to spend 65% of their total

income on the medical plan.  (IUE-CWA 154-155) The Snedigar family faces a medical

premium payment of $2,012.54, or 86% of their income, at a time when the mother in the family

was recently diagnosed with cancer and requires chemotherapy and radiation treatments.  (IUE-

CWA 156-157)  The Snedigars decided to select the COBRA coverage for the mother, leaving

the father and son without medical benefits.  Mrs. Lady and Mr. Snedigar testified about the

extraordinary harm which will be imposed on them if Visteon discontinues paying for the

Benefits. Mr. Snedigar described how he and his wife have been affected by the notice that

Visteon would no longer pay for their benefits:

> Well, loss of sleep.  A lot of sleep.  My wife's got cancer, like I said, and for about the
> last month, she's been up just every twenty minutes all night long with the cancer
> problem and worrying about this.  I mean, she's apologized to me I don't know how
> many times just for being sick.  And it just bothers me.  It's not her fault but she just says
> I'm sorry I got the family in this situation.  There's nothing she can do.

(IUE-CWA 406:15-22).

Mrs. Lady explained that her husband has emphysema and other medical problems but

that they cannot afford to purchase any of the COBRA options offered by Visteon. She stated:

"[D]on't ask me to look at my husband and say I'm sorry, honey.  I can't give this medicine to

you today.  You can't breathe today because I can't buy it.  Or, come on, let's sell the house.

What I worked for all my life, and I worked hard, you're taking from me." (IUE-CWA 412:4-8).

For those with serious health problems, the lack of medical coverage will cause serious

injury, and perhaps, death.  Judge Sontchi found that "people who are Medicare-ineligible and

are not going to be able to afford to get health insurance are going to suffer irreparable harm."

(IUE-CWA 470:16-18).  Since less than 10% of those eligible for the COBRA benefits have

decided that they can pay for the Benefits themselves, the vast majority of Retirees will be left

without any medical coverage.  (IUE-CWA 305, ¶ 18).

According to the Third Circuit:  "The irreparable harm requirement is met if a plaintiff

demonstrates a significant risk that he or she will experience harm that cannot adequately be

compensated after the fact by monetary damages."  *Adams v. Freedom Forge Corporation*, 204

F.3d 475, 484-85 (3d Cir. 2000).  In *Steelworkers v. Fort Pitt Steel Casting*, 598 F.2d 1273 (3d

Cir. 1979), the court affirmed an injunction preventing the company from ceasing to make

premium payments for medical insurance during a strike pending arbitration of the union's claim

that such action violated its contract.  The court found that the workers would be irreparably

injured absent an injunction, stating:

> Initially, we agree with the district court that the fact that the payment of monies
> is involved does not automatically preclude a finding of irreparable injury.  If the
> risk of 'water pipes freezing' can constitute irreparable injury, See *Celotex Corp.*
> *v. Oil Workers*, 516 F.2d 242, 247 (3d Cir. 1975), then surely the possibility that a
> worker would be denied adequate medical care as a result of having no insurance
> would constitute 'substantial and irreparable injury.' Id. Moreover, the risk of
> irreparable injury was not appreciably lessened merely because the employees
> allegedly would remain covered for 30 days after premium payments were
> terminated and because the employees thereafter would have the option to convert
> to individual policies.  There was no assurance at the time the injunction was
> issued that the strike would end within 30 days; thus there was a significant risk
> that absent an injunction, the employees would be without insurance coverage.  In
> addition, the likelihood that all of the employees could have exercised their right

31

to obtain individual policies was problematic, because while the employees were
on strike, they were not collecting the wages.

*Id.* at 1280.

Here, all of the Retirees are on fixed incomes and, as shown by the declarations

submitted to this Court, the Retirees will not be able to purchase the insurance under the plans

made available by Visteon.  Employees with more than 30 years working for Visteon receive a

total pension benefit of around $2,200 per month (IUE-CWA 134-135, ¶ 3 ($2,250.00); IUE-

CWA 136-138, ¶ 3 ($2116.80); IUE-CWA 147-148, ¶ 3 ($2,14.95); IUE-CWA 154-155, ¶ 3

($2196.32).)  Only a small number of Retirees have opted to purchase one of the COBRA plans

offered by Visteon.

The Third Circuit in *Adams* cautioned against using "common sense" to determine

irreparable harm for a group of similarly situated individuals.  204 F.3d at 487.  In *Adams*, the

court vacated an injunction preventing an employer from modifying the retiree medical plans by

requiring retirees pay a portion of their premiums, ranging from $20 to $90 per month.  *Id.* at

480.  Given the modest premium payments imposed, the court held that many of the plaintiffs

had not presented sufficient evidence that they were "threatened with a financial burden that

would force them to eschew medical treatment or other necessities such as food or shelter."  *Id.*

at 490.  The *Adams* court also opined:

> We do not think that the precept that multiple plaintiffs must adduce evidence
> from which it might be inferred that each of them is threatened with harm will be
> a serious hurdle to plaintiffs.  Simple affidavits should typically suffice.
> Moreover, in many instances, the defendant will be incapable of severing its
> conduct towards one plaintiff from that towards another.

*Id.* at 489.

IUE-CWA is not required to show the harm to every individual Retiree.  Rather,

irreparable harm to a group of individuals can be shown if they are in similar circumstances and

are treated similarly by the Debtors. As the Third Circuit stated in *Adams*: "when a court infers a risk of harm to all individuals although only a few testify, it is reasoning inductively … the daily work of fact-finders." 204 F.3d at 487.  IUE-CWA has met this burden.

Here, Visteon is ending its payment of the Benefits for all Retirees and offering replacement plans for which the Retirees must bear the entire premium cost.  All of the Retirees are on fixed incomes receiving pension benefits which are not generous.  Thirteen Retirees have submitted declarations showing the financial burden imposed by Visteon's termination of its payment for the  Benefits and how eliminating this payment could force them to go without medical treatment, medications or other necessities.  Two Retirees testified eloquently about their inability to pay for the health benefit plans offered by Visteon and the serious injury they would suffer as a result. Since the entire cost of the Benefits is being shifted to the retirees, the facts of this case are closer to the situation in *Fort Pitt* than to that in *Adams*.  This Court may infer from the evidence presented that all of the non-Medicare eligible retirees are being similarly treated, have similar financial circumstances and will be irreparably injured by the Debtors' termination of payment for the Benefits.

## IV.    OTHER PARTIES WILL NOT BE SUBSTANTIALLY INJURED IF THE DEBTORS' CONTRIBUTION TO THE BENEFITS IS CONTINUED

If this motion for a stay pending appeal is granted, the injury to the Debtors is not substantial.  While the Debtors would be required to continue to pay for the Benefits for the 840 Retirees, during the pendency of this appeal, the cost of that continuation would be insubstantial to the Debtors.  According to the Debtors, the cost of providing the Benefits to all 2,100 IUE-CWA retirees who had been covered by retiree medical benefits was $1.1 million per month. (Docket No. 2475, ¶ 48). IUE-CWA seeks this stay for the approximately 840 non-Medicare eligible retirees, substantially reducing this cost. Because the Connersville and Bedford Plants

have closed, there are no active employees accruing the right to receive retiree medical benefits. (Docket No. 424, ¶ 25).  Thus, this amount will only decrease as the Retirees reach age 65 and become eligible for Medicare benefits.

During this bankruptcy proceeding, the Debtors have done "quite well" (Transcript of hearing, February 18, 2010 (IUE-CWA 202-203).  Indeed, the Debtors exceeded their EBITDA projections for the month of January, 2010 by over $20 million.  (*Id.*)  On February 26, 2010, Visteon announced its 2009 results, reporting net income of $128 million (increased by $809 million from 2008) and adjusted EBITDA of $454 million (increased by $96 million from 2008) with a year-end cash balance of nearly $1.1 billion (IUE-CWA 204-206). Thus, an additional monthly payment of substantially less than $1.1 million for the Benefits will not pose any serious financial difficulty for the Debtors.

Visteon asserted that retirees who have already made a COBRA selection would suffer an interruption of their health benefits if Visteon is required to pay for the COBRA benefits of the non-Medicare eligible Retirees.  However, this assertion is belied by the COBRA Notice distributed to Retirees, which provides as follows:

> Under federal law you have up to 60 days after the qualifying event of April 1, 2010, to decide whether you want to elect COBRA continuation coverage.  If you do not return a completed Election Agreement by your Election End Date of May 31, 2010, you will lose your right to elect COBRA continuation coverage.

(IUE-CWA 248).

Thus, all of the Retirees continue to have the option to make a COBRA selection until May 31, 2010.  It cannot be the case that the coverage of each retiree will be temporarily disrupted whenever any Retiree makes a COBRA selection after April 1, 2010.  And one or all of the Retirees are entitled to make that selection. The requested stay does not require a change in the benefit plan offerings, since one of the COBRA plans offered is the same plan of benefits

now provided to the Retirees, described as "VS Hourly Retiree BCBS PPO".  (IUE-CWA 250).

The proposed stay would merely require Visteon to assume the cost of the COBRA coverage for

each Retiree.  Thus, no other retiree need be affected if additional retirees are added to those who

are covered by the new plans offered.

## V.  THE PUBLIC INTEREST FAVORS CONTINUATION OF VISTEON'S PAYMENT FOR THE BENEFITS

Officials of the local governments of Connersville and Bedford, IN have submitted letters

explaining the devastating effect on those localities if retiree health benefits are eliminated.  The

Mayor and City Council of Connersville stated in a letter to this Court that the termination of

health benefits for Visteon retirees would have "a severe economic impact on the other citizens

of Connersville who are not employed by Visteon.  This would be devastating to our local

hospital and other healthcare facilities."  (IUE-CWA 115).  The Fayette County Board of

Commissioners, covering Bedford, IN, stated in a letter submitted to this Court, that if Visteon

retiree medical benefits were "taken away, the systemic 'ripple effect' that would permeate the

local economy would be devastating.  The far-reaching impact of such a loss would impact the

health care system, housing, welfare, education, etc.  The overall economic effect would be one

of total depression."  (IUE-CWA 116). The Mayor of Connersville, Leonard Urban testified

about how the City of Connersville was already devastated by the closing of the Connersville

Plant, the largest employer in the City:

> It was devastating.  The utilities were just almost bankrupt.  We had to make all
> kinds of turnaround with that.  Raise the [rates].  And, of course, when you raise the rates,
> I suffer with twenty to thirty shut-offs a month.  People can't pay their water bill.  The
> hospital – you saw the records, how much they had to give away in services.  Just
> everything is like that.  People can't pay their taxes.  We have the highest foreclosure rate
> ever in the history of a town.

(IUE-CWA 415:17-24).

Mayor Urban also described how the hospital would lose $1.3 million a year, and he did not

know if they would survive if Visteon stopped paying for the Benefits.  (IUE-CWA 416:21-

417:7).

The Debtors argued that the public interest favors their reorganization and emergence

from bankruptcy.  Judge Sontchi questioned whether it was in the public interest to reorganize a

company to preserve "jobs in South Korea as opposed to Indiana". (IUE-CWA 471:16-18).  The

Debtors did not present evidence that the reorganization would be endangered if Visteon is

required to continue paying for the Benefits.

## VI.    THE STAY SHOULD BE GRANTED WITH THE POSTING OF EITHER NO BOND OR A NOMINAL BOND

The Retirees here survive on fixed incomes and could not post a bond to cover the cost of

the Benefits.  Similarly, the IUE-CWA is a labor organization of limited resources, particularly

with the recent loss of so many U.S. manufacturing jobs, such as those in the Connersville and

Bedford Plants.  The posting of a bond for a stay pending appeal is not a requirement of Rule

8005, Fed. Bankr. R. Pr.  Rule 8005 states that "the district court … *may* condition the relief it

grants under this rule on the filing of a bond or other appropriate security with the bankruptcy

court." (Emphasis added).

Thus, the posting of a bond is not mandatory under Rule 8005, but is within the discretion

of this Court. *In re Byrd*, 172 B.R. 970, 974 (W.D. Wash. 1994); *In re Sphere Holding Corp.*,

162 B.R. 639, 644-45 (E.D.N.Y. 1994); *In re Westwood Plaza Apartments*, 150 B.R. 163, 169

(E.D. Tex. 1993).  Courts have imposed either no bonds or nominal bonds on retirees when

enjoining the discontinuation of health benefits.  *Bailey v. AK Steel Corp.*, 2006 WL 2727732

*12, No. 1:06cv468 (S.D. Ohio Sept. 22, 2006); *Cole v. Arvinmeritor, Inc.*, 2005 WL 3502182

(E.D. Mich. 2005); *Warner v. Ryobi Motor Prods. Corp.*, 818 F. Supp. 907, 909 (D.S.C. 1992)

($250 bond required where retirees had limited assets); *Mamula v. Sataralloy, Inc.*, 578 F.Supp. 563, 579 (S.D. Ohio 1983).  Similarly, in this case, the retirees and the IUE-CWA should not be compelled to post a bond other than in a nominal amount.

## **CONCLUSION**

For all of the foregoing reasons, the motion of IUE-CWA for a stay of the Order under 11 U.S.C. §§ 1105, 363(b)(1) and 1108 Authorizing Debtors To Amend Or Terminate Post-Employment Health Care And Life Insurance Benefits For Certain Employees and Retirees and Their Surviving Spouses, Spouses, Domestic Partners, and Dependents entered on December 22, 2009 should be granted to the extent that the Order authorizes Visteon to discontinue payments for Benefits for those IUE-CWA retirees not eligible for Medicare benefits.

Dated: March 18, 2010                    KENNEDY, JENNIK & MURRAY, P.C.


                                         */s/ Susan M. Jennik*
                                         Susan M. Jennik, Esq.
                                         113 University Place, 7th Floor
                                         New York, New York 10003
                                         (212) 358-1500

                                         And

                                         COOCH AND TAYLOR, P.A.


                                         */s/ Susan E. Kaufman*
                                         Susan E. Kaufman, (DSB#3381)
                                         1000 West Street, 10th Floor
                                         The Brandywine Building
                                         Wilmington, DE 19899
                                         (302) 984-3893 / (302) 984-3939 Fax
                                         Skaufman@coochtaylor.com

                                         Attorneys for IUE-CWA

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **IUE-CWA, the Industrial Division of the Communications Workers of America, AFL-CIO, CLC,** | ) ) ) | **Case No. 10-CV-00091-MMB** |
| | ) | |
| **Appellant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **VISTEON CORPORATION, *et al.* and THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF VISTEON CORPORATION, *et al.*** | ) ) ) ) | |
| | ) | |
| **Appellees.** | ) | |
| _____ | ) | |
| | ) | **On Appeal from U.S.** |
| **In re:** | ) | **Bankruptcy Court** |
| | ) | |
| **VISTEON CORPORATION, *et al.*,** | ) | **Chapter 11** |
| | ) | |
| **Debtors.** | ) | **Case No. 09-11786 (CSS)** |
| | ) | **(Jointly Administered)** |

Certificate of Service

I, Susan E. Kaufman, hereby certify that on March 18, 2010, I electronically filed the **MEMORANDUM OF LAW AND APPENDIX IN SUPPORT OF EMERGENCY MOTION FOR EXPEDITED CONSIDERATION AND MOTION FOR STAY, PENDING APPEAL, OF THE ORDER UNDER 11 U.S.C. §§ 105, 363(b)(1), AND 1108 AUTHORIZING DEBTORS TO AMEND OR TERMINATE CERTAIN POST-EMPLOYMENT HEALTH CARE BENEFITS AND LIFE INSURANCE BENEFITS FOR CERTAIN EMPLOYEES AND RETIREES AND THEIR SURVIVING SPOUSES, SPOUSES, DOMESTIC PARTNERS, AND DEPENDENTS** with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

James E. O'Neill, III, Esq.
Pachulski, Stang, Ziehl & Jones, LLP
919 North Market Street, Suite 1600
Wilmington, DE 19899

Gregory A. Taylor, Esq.
Ashby & Geddes
500 Delaware Avenue
8th Floor
Wilmington, DE 19899

I hereby certify that on March 18, 2010, I have served by Overnight Mail and E-mail the document(s) to the following non-registered participants:

Steven D. McCormick, Esq.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
smccormick@kirkland.com

Howard L. Siegel
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
hsiegel@brownrudnick.com

COOCH AND TAYLOR, P.A.


/s/ Susan E. Kaufman
Susan E. Kaufman (DSB # 3381)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE 19801
(302) 984-3820
(302) 984-3939 Fax
skaufman@coochtaylor.com